IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | | |
|---|---|---|
| John Gonzales and Becky Gonzales, | ) | No. CV-04-0023-PHX-NVW |
| Plaintiff, | ) ) | **ORDER** |
| vs. | ) ) | |
| Harley-Davidson Motor Company Group, Inc., | ) ) ) | |
| Defendant. | ) ) ) | |

On March 25, 2005, Defendant Harley-Davidson Motor Company Group, Inc. filed four motions that are now before the court: Motion to Exclude Mark Ezra (Doc. #32), Motion to Exclude Gary Kmiecik (Doc. #29), Motion for Partial Summary Judgment (Doc. #30), and Motion for Summary Judgment (Doc. #31).

**I. Background**

**A. Facts**

On April 24, 2002, while riding his 2000 Harley-Davidson Road King FLHT platform touring motorcycle Gonzales was involved in a single-vehicle accident. (DSOF ¶ 1.) Right before he crashed, Gonzales allegedly encountered a perturbation of his motorcycle at or near 70 miles per hour that caused him to lose control. (DSOF ¶ 2.) The motorcycle was not preserved for examination by experts after the accident, although it was later recovered.

1  (DSOF ¶ 7.) Gonzales filed a Complaint in Arizona state court and Harley-Davidson
2  removed to this court. (DSOF ¶ 8-9.) The Complaint alleged strict liability, negligent design
3  and manufacture, and negligent failure to warn. Gonzales disclosed Mark Ezra and Gary
4  Kmiecik as expert witnesses in November 2004. Harley-Davidson moves to strike both
5  witnesses. The court held a *Daubert* hearing on these motions on July 1, 2005, at which Ezra
6  testified to his opinions.

7  In the event the court grants the motions to strike, Harley-Davidson moves for
8  summary judgment on the ground that Gonzales then lacks any admissible evidence to
9  sustain his claims. Gonzales has conceded that summary judgment must be granted against
10 him if the court strikes Ezra as an expert witness. If the court denies the motions to strike,
11 Harley-Davidson, moved for partial summary judgment on the failure-to-warn claims, but
12 Gonzales subsequently withdrew these claims. Thus, the dispositive inquiry on these
13 motions is whether Ezra should be permitted to offer his opinions as an expert witness.

**B. Theories of Motorcycle Stability**

15 The starting point for evaluating Ezra's opinions is an understanding of motorcycle
16 design. The parties agree about several basic aspects of motorcycle design. First, a
17 motorcycle is at its core two free castors joined on a common steering axis. Mark A. M.
18 Ezra, *Forensic Engineering Investigation of Motorcycle Instability Induced Crashes*, 21 J.
19 of the Nat. Acad. of Forensic Eng'rs 68, 70 (2004). The castored wheel is designed to be
20 self-centering so that if it is deflected from its path, it will automatically return to the path
21 the vehicle is following. *Id.* A motorcycle can be disturbed in a way that prevents the castor
22 from self-centering. *Id.* When this happens the motorcycle will oscillate from the centered
23 position. Castor instability in motorcycles is referred to as "wobble" and "weave." *Id.* at 71.
24 According to the Society of Automotive Engineers, wobble is "the oscillation of the
25 motorcycle's front steering frame about the steering axis" and weave is "the oscillation of the
26 motorcycle frame and rear wheel assembly about the steering axis." *Id.* The allegation in
27 this case is that Gonzales' motorcycle experienced a weave.

1    A motorcycle cannot be designed to eliminate the weave phenomenon. Motorcycles tendency to weave poses a threat to rider's safety, especially because rider response aggravates the weave. The typical frequency range of the weave is 2 to 4 Hz, which is the same or higher than the generally accepted human response of 2 Hz. *Id.* Thus, the rider who tries to control the weave actually adds energy to the oscillations. *Id.* A motorcycle can be designed to quickly reduce or dampen the weave's amplitude. The vehicle's ability to recover from a weave is a measure of its safety.

   The parties disagree as to how quickly a motorcycle should have to dampen out of a weave for it to be reasonably safe. Ezra contends Gonzales' Harley-Davidson motorcycle crashed because a design defect prevented it from reducing the amplitude of a weave within a safe period of time. He propounds that a reasonable response of a motorcycle in weave or wobble should be a 1/e (which equals 37%) decay time of between one-half and three-quarters of a second. This means that the peak amplitude oscillation should decay to an amplitude of 37% of the initial peak in one-half to three-quarters of a second. Ezra, *supra*, at 79. The time in which the amplitude oscillation should dampen out was derived from the generally accepted human perception and reaction times. It is generally accepted that humans perceive in three-quarters of a second and react in one and a half seconds. Because human response to a divergent weave aggravates the weave, Ezra believes that the weave should be reduced to 37% of the initial amplitude before a human can react. If the weave dampens out this quickly, "the oscillations will decay at a rate sufficiently fast that the rider of the motorcycle will have insufficient time to perceive and react to a weave or wobble oscillation before it has died out." *Id.*

   Ezra conducted tests with various models of Harley-Davidson's and concluded that they did not dampen out at this rate. Although Ezra did not test the specific model motorcycle Gonzales was driving, he contends the design is the same as the ones he tested and that his results can be extrapolated to that model. Thus, he concludes that Gonzales' 2000 Road King touring platform FHLT motorcycle is defectively designed because it does not sufficiently dampen out the amplitude of a weave before a human can react.

Harley-Davidson does not have an objective decay rate that its motorcycles must meet. Rather, any new motorcycle it manufacturers must be as good or better than previous models in terms of design and performance. In the course of this litigation Harley-Davidson tested the model motorcycle Gonzales was riding at the time of his accident. For testing purposes the company used a 50% decay rate in one-half to three-quarters of a second because, according to its expert, this quantity is easier to graph than a 37% decay rate. Gonzales' model motorcycle dampened to half amplitude on average 0.36 seconds at 70 miles per hour. Harley-Davidson converted the data to determine whether it met Ezra's criteria. On average, across 80 test runs, the motorcycle achieved a 37% decay rate in 0.76 seconds, which is an immaterial one-hundredth of a second slower than Ezra recommends. While Harley-Davidson disagrees with Ezra's proposed measure of safety, they maintain that on average the 2000 Road King meets his measure of safety.

## II. Legal Analysis

### A. The Standards Governing Admissible Expert Testimony

Although Harley-Davidson has moved to strike Ezra, Gonzales bears the burden of establishing that Ezra meets the admissibility requirements for experts by a preponderance of the evidence. *Cloud v. Pfizer Inc*, 198 F. Supp. 2d 1118, 1129 (D. Ariz. 2001) (citing *Bourjaily v. United States*, 483 U.S. 171, 175 (1987)). Federal Rule of Evidence 702 governs the admissibility of expert testimony and provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

This Rule aims to both assist the trier of fact's "search for truth by helping it to understand other evidence" and preserve the trier of fact's power to decide the meaning of evidence. Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 6262 (3d 2004). Satisfying both of these goals is difficult because "both the admission and exclusion of expert testimony can undermine the traditional powers of the trier of fact." *Id.* Expert testimony

- 4 -

can add to the jury's knowledge or it can mislead it with unreliable assertions. The Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), set forth "the guideposts" for achieving this balance and properly determining the admissibility under Rule 702. *Diviero v. Uniroyal Goodrich Tire Co.*, 919 F. Supp. 1353, 1354 (D. Ariz. 1996), *aff'd*, 114 F.3d 851 (9th Cir. 1997).

The Supreme Court empowered trial judges to act as "gatekeepers" for expert testimony and "ensure that any and all scientific testimony evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 598. In its role as gatekeeper, the court does not "serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Miss.*, 80 F.3d 1074, 1078 (5th Cir. 1996). As the Court predicted in *Daubert*, lower courts rely on "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof . . . [to] attack[ ] shaky but admissible evidence." 509 U.S. at 595. Nonetheless, trial judges have very broad discretion to determine the admissibility of expert testimony, *Salem v. United States*, 370 U.S. 31, 35 (1962), and must exclude testimony supported only by speculation or unfounded conjecture. *Daubert*, 509 U.S. at 589-90.

*Daubert* and the two cases that originally set validity standards for scientific evidence, *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), and *United States v. Downing*, 753 F.2d 1224 (3d Cir. 1985), have recommended that courts consider the following factors in determining the validity of scientific evidence: 1) whether the proffered theory can be tested; 2) whether the theory has been subjected to peer review; 3) the error rate, types of errors, and which party such errors negatively effect; 4) whether there are standards governing the methodology; 5) the degree of acceptance within the scientific community of the theory; 6) whether there is professional literature appraising the methods or theory; 7) the novelty of the theory and relationship to other methods. *See* Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence*, § 353 (2d 1994) (listing these factors). These factors have not been codified and are neither exclusive nor dispositive. *See Daubert*, 509 U.S. at 594; Fed. R. Evid. 702 advisory committee notes.

The district court first determines whether the expert has the minimal qualifications in a relevant field to be considered an expert. *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). Ezra has a Bachelor of Science in Mechanical Engineering and a Diploma of Technology from the Victoria University of Manchester and has been a consulting and forensic engineer specializing in the analysis of motorcycle accidents, motorcycle stability, gas tank design, and leg guarding motorcycles since 1979. For purposes of this motion, Harley-Davidson is not challenging Ezra's qualifications.

The court must then decide whether Ezra's testimony is relevant and reliable. Harley-Davidson does not dispute that Ezra's opinion is relevant in the sense that it "speaks clearly and directly to an issue in dispute in this case." *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 43 F.3d 1311, 1321 (9th Cir. 1995) ("*Daubert II*"). The dispositive issue in this case is whether Gonzales' motorcycle had a defective design that caused him to crash, and Ezra will testify that it did. Harley-Davidson contends that Ezra's testimony will not assist the trier of fact, as required by Rule 702, because it is not based on sufficient data, not derived from reliable methods, and unreliably applied to these facts. *Daubert II*, 43 F.3d at 1321 n. 17.

### B. Ezra's Proposed Measure of Safety

Ezra contends that to be reasonably safe Harley-Davidson's motorcycles should decay to 37% of the initial amplitude of the weave in one-half to three-quarters of a second. The court has serious doubt that this measure of safety, as opposed to 50% or some other number, is anything more than Ezra's subjective preference. Ezra's standard of 37% decay rate is based on the generally accepted human perception and reaction times. Because human response to a weave aggravates it, Ezra believes that the weave should be reduced to 37% of its initial amplitude in one-half to three-quarters of a second. Thus, to reach his standard measure of safety, Ezra simply made an educated guess as to what is safe based on the decay rate and human reaction times.

Ezra has done no empirical testing to substantiate his measure of safety. Such testing might validate that humans respond in the proffered time or, just as plausibly, might show that Ezra's measure is unnecessarily demanding. Ezra acknowledges that his standard encompasses what he thinks is an appropriate margin of safety, which means that it is intended to be safer than minimal safety. But he offers no quantification of how much of the standard is extra safety and how much is minimal safety. The court recognizes, of course, that testing the proposed measure of safety may be infeasible because of the risk to test riders. Yet even passing over the lack of empirical testing, his proposed standard of decay to 37% of the initial amplitude of the weave in one-half to three-quarters of a second is not shown to be anything more than a subjective preference for an amount of extra safety, rather than an identification of the limit of safety itself. The critical last step in Ezra's formulation of his standard of safety is incapable of replication, thus disqualifying it as reliable science.

Ezra's standard is also not generally accepted in the scientific community. Granted, no governmental body or industry group has proposed any standard decay rate for a reasonably safe motorcycle. This is because, as the engineering scholars Dr. G. E. Roe and Dr. T. E. Thorpe conceded, "[i]t is very difficult to establish an absolute standard of . . . weave decay times." G. E. Roe & T. E. Thorpe, *The Influence of Frame Structure on the Dynamics of Motorcycle Stability*, SAE Paper No. 891772 (1989). While a briefer decay time is always preferable, it may not be necessary for safety or achievable in fact.

The only other identified measure was set forth by Dr. Thorpe and Dr. Roe, on whom Ezra himself relies. In 1980, they wrote that all motorcycles should be capable of a decay time of less than two and a half seconds for weave. Nine years later, they revised their assessment, writing that "[m]ore than 2 seconds . . . could certainly present a control problem to anyone other than an experienced rider" and that "[a] one second decay time would be excellent." Thorpe and Roe's measure of safety is thus more stringent than that proposed by Ezra.

Ezra's standard has been published in a peer-reviewed article in the June 2004 edition of the *Journal of the National Academy of Forensic Engineers*.  The rigors of peer review generally "increase the likelihood that substantive flaws in methodology will be detected." *Daubert*, 509 U.S. at 593.  It is also an indication that the theory is taken seriously by others in the field.  *Daubert II*, 43 F.3d at 1318.  Most articles that are subjected to peer-review discuss whether a proffered hypothesis was proved correct through testing.  The reviewers ensure that the author used sound scientific principles to test the hypothesis and draw conclusions.  Ezra's article served a different purpose though. It "suggested methods of evaluation of single vehicle motorcycle crashes where weave or wobble mode instability is claimed" for potential expert witnesses.  Ezra, *supra*, at 84.  The court cannot say with confidence that the peer review process for Ezra's article was done with appropriate rigor when the purpose of the article was not to report on the validity of a hypothesis or propose a measure of safety.  Thus, the fact that Ezra's article was peer-reviewed for the community of retained litigation experts does not weigh heavily in favor of its reliability as a measure of safety.

Ezra's standard of safety must be discounted further because it was developed for a prior lawsuit involving Harley-Davidson motorcycles. The Ninth Circuit has held that courts should consider "whether the experts are proposing to testify about matters growing naturally and directly out of research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying." *Daubert II*, 43 F.3d at 1317.  If an expert's testimony is not based on his independent research, then the proponent of the evidence "must come forward with other objective, verifiable evidence that the testimony is based on 'scientifically valid principles.' " *Id.* at 1318.  The proponent can meet this burden "by proof that the research and analysis supporting the proffered conclusions have been subjected to normal scientific scrutiny through peer review and publication." *Id.*  Ezra's measure of safety was published in a peer-reviewed journal, but due

to the nature of the article, the court is not persuaded that it was "subjected to normal scientific scrutiny" in the sense that matters for this motion. *Id.*

Because Ezra's measure of safety is based on a preference, rather than replicable analysis, for extra safety where the limit of true safety is unknown, unsupported by any empirical tests, not generally accepted in the scientific community, and created for the purpose of litigation, the court is not persuaded that it is reliable as required by Rule 702(2). This conclusion is based, of course, on the specific evidentiary record made in this case.

**C. Ezra's Testing of Harley-Davidson Motorcycles**

To determine whether Harley-Davidson's motorcycles met his measure of safety, Ezra tested several models. The tests on which Ezra relies for this case were performed in June 2004 for another lawsuit. He and a partner took turns riding a motorcycle up to a test speed on a clear track. The rider then moved the handlebars rapidly from right to left to induce a weave oscillation. As the motorcycle entered the weave, the rider made no intentional movement to the steering assembly, although he still held on to the handlebars. This scenario was tested on a straight and a curved path. The motorcycle was equipped with various instruments to measure its reaction to the disturbance. A potentiometer attached to the handlebars was used to measure steering assembly oscillations. A GPS receiver, which measured the motorcycle speed, and a Bosch rate sensor were mounted to the rear extremity of the motorcycle. Ezra refers to his method as "system response testing" and explains that it "is not designed or intended to reproduce a particular crash scenario, but rather to provide data upon which an engineer may reliably infer the probable response of the motorcycle and rider in uncontrolled situations." Ezra, *supra*, at 82-3. He claims that system response testing is generally accepted and used in the aerospace and automobile industries, though he does not state that it is used in those industries to measure weave recovery rate or anything similar. *Id.*

Ezra and his partner made a total of 45 test runs, but data could be reduced from only 35 of them. Of those 35 runs, Ezra evaluated 16 and concluded that the motorcycles satisfied

his decay rate 6 times and failed 10 times. From these data Ezra inferred, without identifying any culpable system component, that Harley-Davidson FHLT touring platform motorcycles are unreasonably dangerous and defectively designed. Harley-Davidson had its own expert reduce the data from the 19 runs Ezra did not evaluate and found that the motorcycle satisfied Ezra's decay rate in 15 runs and failed in 4 runs. Overall the motorcycle decayed at Ezra's recommended rate 21 times and failed 14 times for a 60% success rate. Ezra disagrees with Harley-Davidson's methodology for reducing the data and therefore with its conclusions concerning satisfaction of his decay rate, but the court finds Ezra's reasons for rejecting the 19 runs unpersuasive.

### 1. The reliability of Ezra's methodology

The court evaluates Ezra's methodology under *Daubert*, its progeny, and Rule 702. When scrutinized under these standards, the methodology proves unreliable for several reasons. First, while Ezra's tests could be run again, his opinion cannot be validated through duplicative testing. Ezra's tests were not successively performed under the same conditions and therefore cannot now be tested to produce similar results. Ezra also did not control for the different variables such that the test runs could be repeated. For each test run, the speed, the rider, the suspension setting, and the curve of the path differed, yet Ezra never tested a motorcycle multiple times under the same combination of variables. In other words, no combination of variables was tested more than once. Ezra did not run a sufficient number of tests across one variable set such that it could be collapsed and conclusions drawn from it. Rather, he admittedly gathered 35 separate data points and drew conclusions about the motorcycle's one-time performance under each particular variable set of only 16 of them.

Ezra admits that the test runs are not designed to be repeatable but claims that he can still reliably measure the response of the motorcycle in these uncontrolled situations. Ezra cannot reliably infer the response of the motorcycle through his testing method because he does not control for the driver's input. Harley-Davidson subjects its motorcycles to free response testing by having the driver remove his hands from the handlebars after inducing

- 10 -

the weave and then excluding from the data the peaks during which the driver was still giving input. Ezra and his other driver kept their hands on the handlebars during the test runs and did not control for or measure rider input. Ezra did not test the free response of the motorcycle but the response based on unmeasured rider input. Thus, even accepting Ezra's claim that the tests are designed to measure the response in uncontrolled situations, the tests did not reliably do this because the driver's input was not quantified. In short, Ezra did not ensure the vehicle's decay rate but rather the sum of the decay rate and the rider input.

Ezra's methodology is also unreliable because there is no evidence that system response testing is generally accepted in the scientific community and when such testing is employed, it is under tightly controlled conditions. A test's reliability is enhanced if there are standards governing it that are followed and it is generally accepted within the scientific community. Ezra maintains that system response testing occurs regularly in the automobile and aerospace industries, but neither he nor Gonzales produced any evidence that these methods are generally accepted in the scientific community or in these industries for an inquiry like the one at issue in this case. There is also no evidence that Ezra's theory that Harley-Davidson motorcycles are defective is generally accepted. Harley-Davidson points out that the test scenarios for automobiles are performed under extremely controlled conditions were the variables have been carefully measured and the tests run thousands of times to ensure reliability. Thus, there are standards governing system response testing that are vastly more stringent than those applied by Ezra. These factors detract from the reliability of Ezra's methodology.

Ezra's methodology is also unreliable because there is no known error rate or confidence interval. *Daubert* recommends that courts consider a test's error rate, and how that rate impacts each side's contentions. In this case, however, there is no known rate of error. *See Soldo v. Sandoz Pharm. Corp.*, 244 F. Supp. 2d 434, 569 (W.D. Pa. 2003) (finding "the potential error rate unacceptably high, if not completely unknown or unknowable"); *Gabbard v. Linn-Benton Hous. Auth.*, 219 F. Supp. 2d 1130, 1138 (D. Or.

2002) (finding that there is no known rate of error contributed to exclusion of expert testimony). Some statisticians also employ confidence intervals, but here the confidence interval is indeterminable because the test-to-test variation was not quantified.

Finally, Ezra's methodology is unreliable because it is not based on sufficient facts or data. See Fed. R. Evid. 702 (making one of the requirements for expert testimony that "the testimony is based upon sufficient facts or data"). Ezra analyzed only 16 of the 45 runs he and his partner performed. No data could be produced from 10 of the runs and he simply did not reduce the data on the remaining 19. Harley-Davidson calculated the decay rate for those 19 runs and found that they satisfied Ezra's criteria 15 times. Ezra also relies on several propositions that he has not tested or attempted to quantify in forming his opinion about Harley-Davidson motorcycles. Specifically, he has not determined whether there is variability inherent in the assembly of the FLHT platform motorcycles or the variation in the engine mount stiffness that produces an adverse effect on handling. Ezra draws educated inferences about these systems' variability, but even educated inferences are not a substitute for the scientific method.

One factor that weighs in favor of reliability is that Ezra's methodology was described in a peer-reviewed article. As discussed previously, however, the court has serious doubt that the traditional rigors of peer review applied in this case because the article was intended to describe a method others could use for litigation. While the peer-reviewed status of the article weighs in favor of reliability, it is insufficient to overcome the numerous factors that render Ezra's testimony unreliable, such as his failure to control for numerous variables, failure to quantify driver input, failure to run any test scenario more than once, drawing conclusions from less than half of the data collected, and a lack of a known error rate or confidence interval. In short, Ezra's theory that Harley-Davidson motorcycles fail to satisfy his measure of safety is the product of unreliable tests and insufficient facts and data.

**2. Applying the theory to the facts of this case**

Even if Ezra's methods were reliable, his theory was not reliably applied to the facts of this case, as required by Rule 702. *See In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994) (explaining that "*any* step that renders the analysis unreliable . . . renders the expert's testimony inadmissible" . . . regardless of "whether the step completely changes a reliable methodology or merely misapplies that methodology"). Ezra maintains that Gonzales' accident was due to his motorcycle entering a weave oscillation at or near 70 miles per hour and that Gonzales could not have done anything to recover control once the motorcycle began weaving. Ezra further claims that no actions by Gonzales, either prior to or at the time of the accident, caused the motorcycle to have unstable weave oscillations. Ezra has tested a 1999, 2001, and 2003 FLHT platform Harley-Davidson motorcycle, and two competitor's models but claims his results can be applied to any FLHT platform touring Harley-Davidson motorcycle from 1999 to 2003.

The application of Ezra's theory to Gonzales' accident is unreliable and speculative. Ezra has never seen or inspected Gonzales' motorcycle and has no evidence of an actual defect in it. Ezra cannot show through any means besides conjecture that any alleged defect manifested itself and caused Gonzales to enter a weave. Ezra also lacks sufficient information to fully reconstruct the accident. Specifically, he does not know the amplitude or duration of the alleged weave. Harley-Davidson contends that Gonzales' motorcycle had different design features than those Ezra has tested that could have impacted its response to a weave. Ezra has admitted that different features, such as the type of load in the saddlebags and the rider's weight, could influence the weave oscillations, but he has not accounted for these variables. There are many variables that could have impacted the crash that simply cannot be excluded.

While it is common for experts to extrapolate from existing data, the court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Joiner*, 522 U.S. at 146. Such evidence may mislead the jury rather than be helpful to them. Ezra "unjustifiably extrapolated from an accepted premise to an unfounded

conclusion," in finding that because different models of Harley-Davidson motorcycles failed to meet his measure of safety in some unreplicable tests that Gonzales' motorcycle had a dangerous design defect. Fed. R. Evid. 702 adv. cmt. There is simply "too great an analytical gap" between the Ezra's application of his theory and the facts of this case. *Joiner*, 522 U.S. at 146

In sum, Ezra's testimony fails all three prongs set forth in Rule 702. His theory that Harley-Davidson motorcycles fail to dampen out of a weave in a safe period of time is based on insufficient data and facts and derived from an unreliable methodology. The theory is also unreliably applied to the facts of this case. Ezra's testimony will not assist the trier of a fact determine a fact in issue and its admission would risk misleading the jury into believing that Ezra's opinion is based on scientifically valid principles.

IT IS THEREFORE ORDERED that Harley-Davidson's Motion to Exclude Mark Ezra (Doc. #32) is granted.

IT IS FURTHER ORDERED that Harley-Davidson's Motion for Summary Judgment (Doc. #31) is granted.

IT IS FURTHER ORDERED that Harley-Davidson's Motion to Exclude Gary Kmiecik (Doc. #29) and Motion for Partial Summary Judgment (Doc. #30) are denied as moot. The Clerk of the Court shall terminate this case.

DATED this 26th day of July, 2005.

_____
Neil V. Wake
United States District Judge